## MILLER v. NATIONAL BROADCASTING CO., Inc.

## SAME v. R. C. A. COMMUNICATIONS, Inc.

### Nos. 5581, 5582.

Circuit Court of Appeals, Third Circuit.

Sept. 25, 1935.

Rehearing Denied Oct. 28, 1935.

WOOLLEY, Circuit Judge, dissenting.

Hugh M. Morris, of Wilmington, Del., and Clifton V. Edwards and Henry T. Kilburn, both of New York City, for appellant.

Thomas G. Haight, of Jersey City, N. J., Abel E. Blackmar, Jr., of New York City, and William G. Mahaffy, of Wilmington, Del., for appellees.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

In the court below John M. Miller, to whom Patent No. 1,756,000, for a piezoelectric oscillation generator, was granted April 22, 1930, charged, in two suits, the National Broadcasting Company, Inc., and R. C. A. Communications, Inc., with infringement thereof. The suits were heard together and disposed of by the court below in an opinion reported in (D. C.) 6 F. Supp. 47, 49. It was followed by decrees holding Miller's patent invalid for lack of invention. Appeals therefrom were taken and heard together in this court. The opinion of the trial judge is so thorough and exhaustive of all that can be said on the subject that a court affirming that court's decree can add little, if indeed anything, in the way of opinion without repeating what has been already sufficiently said. We therefore confine our opinion to a narrow compass.

Generally speaking, the case relates to circuits utilizing a piezoelectric crystal or quartz to control oscillation frequencies generated with the aid of a vacuum tube with associated circuits including a tuned plate one. As this quartz or crystal is the basic factor here involved, we note that it has two qualities, to wit, when compressed it develops an electric charge on some of its surfaces and, on the other hand, when it is charged by an electric current, the crystal is itself compressed and expanded. Its use in radio transmission, so far as we are here concerned, largely centers in the work of three men—Professor Cady, the earliest worker, Professor Pierce, the second worker, and Dr. Miller, the plaintiff patentee, the third worker; so that this case, which concerns the use of such crystals in radio transmission, vir-

tually narrows to the question whether in view of the earlier work of Cady and Pierce, of which Miller was informed, the patent of Miller in suit involved invention. The court below, with the witnesses before it, had better opportunity than have we of judging their credibility and the probabilities of their several accounts, and, so informed, held Miller's patent invalid, and our province is to determine whether the trial court, in so holding, committed error.

In taking up that question, we here note several important facts and the dates thereof. Referring to Professor Cady, it appears disclosures of his work were made first in a paper published in April, 1922, in the Proceedings of the Institute of Radio Engineers entitled "The Piezo-Electric Resonator." In his paper he disclosed to the art that a crystal was suitable to control the frequency of a vacuum tube oscillator; that a crystal was a sharply tuned element; that a crystal, like an electrically tuned circuit, had both capacitative and inductive reactance. He treated the crystal as though it were an electric circuit having resistance, capacity, and inductance. He followed this in the same month by an article in the Physical Review entitled "A Piezo-Electric Method for Generating Electric Oscillations of Constant Frequency," wherein he showed the use of a tunable plate circuit to increase the power tube of such oscillators. On May 28, 1921, Cady applied for patent No. 1,472,583 for method of maintaining electric currents of constant frequency, which was granted to him on October 30, 1923.

Referring next to Professor Pierce. He filed an application for a patent on February 25, 1924, for improvement in electrical systems. His work, to which he was attracted by Cady's earlier work, for the first half of 1923, was disclosed in a paper drafted in July and published in October, 1923, in "The Proceedings of The American Academy of Arts and Sciences," in which he described an oscillator, crystal controlled, in which the crystal was connected between the grid and the plate of the vacuum tube and in which an inductance coil was connected in the plate circuit.

The proofs show that these two men frankly and fully collaborated with each other and were, and are, in entire accord with each other as to what each man did in the advance of the use of quartz, that they recognized the fact and scope of the work of each other, and were of one mind as to the patent protection to which each was entitled. It is the use of their inventions by defendants which Dr. Miller claims are infringements.

On September 10, 1925, Dr. Miller applied for, and on April 22, 1930, was granted, patent in suit No. 1,756,000, for piezo-electric oscillation generator. The several works of these men, their relations to each other, the disclosures made, the acts of Dr. Miller, are all fully and fairly discussed by Judge Nields in his opinion and the reasons are therein set forth for his conclusions and why he was influenced by Cady and Pierce's testimony and was not influenced by Miller's.

Turning back to Cady's work and its relation to the radio art, it appears that he was largely instrumental in using quartz therein as a stabilizer of oscillation generated with the aid of vacuum tubes. Following the use of vacuum tube oscillation, the art was for the time being satisfied with the oscillation effected therein, but as it advanced and radio transmitters increased, the need arose that the frequency of oscillation be held more constant. It was to this problem that Professor Cady turned his attention and to the possibility of the use of quartz as answering that need. For years before this the electrical qualities of crystallines, such as quartz, were well known, and, when properly treated, their capacities, as electrical generators, so to speak, and their response when subjected to electric charges, was recognized. But no use was made in the radio art of these crystallines or of their electric functions or practical possibilities. Such use of quartz Cady essayed as early as 1917, and we think his subsequent work and its results are fairly summed up by defendant's counsel as follows: " * * * Cady * * * discovered that slabs of these piezo-electric crystals, when properly cut, had extremely sharp resonance characteristics at radio frequencies and that, when used in suitable circuits, they could be made to control the frequency of oscillations generated by vacuum tube oscillators. He further found that an oscillator, so controlled, was extremely stable as to frequency—in fact was far more stable than an oscillator whose frequency was controlled by an ordinary electrically tuned circuit composed, for example, of an inductance coil and condenser. He also

found that quartz crystals were particularly adapted for this purpose."

In April, 1922, Cady, as we have seen above, disclosed these facts in a paper published in the Proceedings of the Institute of Radio Engineers, wherein he described circuits embodying his discovery. He also regarded the quartz as having the property of an electric tuned circuit. About the same time his paper on the same subject was published in the Physical Review (p. 139).

Cady's work and publications attracted the attention of Professor Pierce, and in 1923, led thereby, he began experiments and reached developments set forth, as we have seen, in a paper published in October, 1923, in the Proceedings of the American Academy of ·Arts and Sciences.

In estimating Cady's work, the trial judge held, and we agree with his finding, that Cady is recognized as the pioneer in the use of piezoelectric crystals and that in his paper "he disclosed to the art that a crystal was suitable to control the frequency of a vacuum tube oscillator; that a crystal was a sharply tuned element; that a crystal, like an electrically tuned circuit, had both capacitative and inductive reactance. He treated the crystal as though it were an electric circuit having resistance, capacity and inductance."

From the proofs, it is abundantly clear that Cady obtained nothing whatever from Miller.

We next turn to Pierce's alleged inventions as bearing on Cady and Miller. Between Cady and Pierce there is no conflict. As stated above, Pierce was attracted by Cady's disclosure. The two men conferred and were in accord as to what improvements each had made and what was the scope of the patentable claims each should make. In that regard the trial judge held, and we agree with his findings and conclusions drawn therefrom, as follows: "In the Fall of 1923, Prof. Pierce conceived of, disclosed to others and reduced to practice, the grid-filament connection of the crystal. At this season Prof. Pierce and Prof. Cady had a conference at Cambridge about their inventions in the use of piezoelectric crystals and about patenting and manufacturing their respective devices. When Prof. Cady was asked whether anything was said at this meeting about crystal connections in the circuit, he said: 'I remember very clearly that Professor Pierce told me that when he first planned to make a circuit oscillate by means of the crystal, he expected to connect the crystal either between filament and grid, or between grid and plate, expecting that if the circuit did not oscillate one way, it would the other.' In a footnote to a letter of October 23, 1923, after the conference, Prof. Cady wrote: 'You notice, perhaps, that my claims cover the case where the resonator is between filament & grid, but not when it is between plate & grid.' Regarding this, Prof. Cady testified: 'As near as I can remember we had compared notes in order to determine what was originated by one of us and what by the other, and I was making clear to him there that I laid no claim to the connection of a crystal between grid and plate.'"

The court then referred to the fact that "early in 1924 crystal controlled oscillators were manufactured and sold by the General Radio Company of Cambridge, Massachusetts, on behalf of Prof. Pierce. The oscillators were so constructed that the crystal might be connected either between grid and plate or between grid and filament," a construction which appears to us to embody the alleged inventions of both Cady and Pierce. The distinctive work done by each is shown in Cady's letter to Pierce of October 23, 1923, where he said: "You notice perhaps that my claims cover the case where the resonator is between filament and grid, but not where it is between plate and grid." On his part, Professor Cady testified: "As near as I can remember we had compared notes in order to determine what was originated by one of us and what by the other, and I was making clear to him there that I laid no claim to the connection of a crystal between grid and plate."

All of these facts and circumstances, save the issue of pending patents, occurred before the early part of 1924.

Turning now to Miller's alleged inventive work, we note his contention that he made his invention, reduced it to practice, and disclosed it to others on November 6, 1923, while the significant fact is that it was not until some 21 months later, September 10, 1925, that he applied for the patent in suit, facts which, together with others detailed in the court's opinion, warranted that court's inquiry to which no satisfactory explanation is given: "There is no occasion to further discuss Miller's work. Why did he defer his application

for a patent a year and a half after the entry of March 24, 1924? The answer is obvious. He never considered himself the inventor of the grid-filament connection of of the crystal with a tunable plate circuit," and also the court's statement that "in view of the above evidence, it is difficult to credit plaintiff's statement in the bill of particulars that he made his invention, reduced it to practice, and disclosed it to others on November 6, 1923, the same day he received Pierce's article." Turning to the proofs, we, as well as the court below, find a lack of dependable proof in support of plaintiff's claim.

It appears that in November, 1923, Professor Pierce, who was widely distributing copies of his article, sent one to Dr. Miller. The latter's contention is that on November 6, 1923, he perfected his invention, but on the very day he wrote Pierce in acknowledging his pamphlet, and while the letter refers to the reports he had heard of Pierce's work on crystal oscillators, his own indebtedness for Pierce's paper, and states what use he was planning to make of crystal and of the valuable assistance Pierce's paper would be in his work, he then made no mention or reference in his letter to Pierce of that date, to the alleged invention which he now claims he had perfected, put in practice, and disclosed to others on that day. His letter says:

"Have had a number of reports with respect to the interesting experiments you have been conducting with crystal oscillators and am greatly indebted to you for sending me a reprint of your paper on this subject.

"We are planning to use these crystals in checking our wavemeters throughout the service and your paper will doubtless be very valuable assistance to us in this work."

If, as he now says, he on that date disclosed it to others, why not to Pierce? When he was telling of the possible uses he hoped to make of crystal, why should he not tell of the actual use he had made of them if in fact he had made such inventive use of them? But this is not all. On November 30th, Pierce acknowledged receipt of Miller's letter:

"I am much obliged to you for your letter of November 6 regarding the crystal oscillators.

"The General Radio Company has, I believe, made arrangements to manufacture the crystal resonators for checking wavemeters. The crystal oscillator will probably be also supplied by the General Radio Company at some later date.

"I shall be very happy to see you at any time that you are in this neighborhood. With best wishes."

To which Miller replied:

"Since I have received your paper on crystal oscillators, I have been experimenting with them to some extent and have had both success and failure. I would like to take advantage of the invitation in your letter of the 30th of November * * * to see you for a few days, in order to obtain some pointers on the subject. I can come at any time which suits your convenience. I will suggest Monday December 17th but would be pleased to have you set a date this month or next which would be more convenient."

From this letter it appears that Miller was led by Pierce's paper to experiment with crystal oscillators; that in so doing he had had both success and failure, and the significant fact is that the visit he proposed to make was "in order to obtain some pointers on the subject." The pertinence and importance of needing and getting pointers in connection with his experimenting on crystal oscillators is made the more significant by the fact that it was arranged the Navy Department, for which he was working, should finance his trip to see Pierce. This then declared purpose of getting information from Pierce carries much greater weight than plaintiff's account of his visit when his testimony in litigation was given, when, in answer to the question, "Do I understand that the net result of your visit to Cambridge in the fall of 1923 was that you gave and did not receive information?" the plaintiff testified: "Yes, excepting in the respect that Processor Pierce advised me to try spectacle lenses." To this may be added plaintiff's remarkable statement, "Dr. Pierce told me that he did not understand the operation of the circuit which he published in his paper and I explained the operation of that circuit to Dr. Pierce," testimony which the trial judge, who heard and saw both men, characterized as, "This testimony calls for no comment."

Adopting as we do, after consideration of all questions in the case, the opinion

of the court below as the foundation of our affirmance thereof, we limit further discussion to quoting and adopting the concluding summary thereof, as follows:

"All the elements of the Miller circuit were disclosed by Prof. Pierce. Prof. Pierce secured oscillations by use of his crystal controlled oscillator employing a tuned plate circuit. He was bound to tune the plate circuit above or below the natural crystal frequency in order to secure the desired oscillations. What could plaintiff contribute except a statement of the theory of operation? Assuming plaintiff did explain the theory underlying the operation of the crystal controlled oscillator employing a tuned plate circuit, that is a scientific achievement of a kind that cannot be the basis of a patent. Whether Prof. Pierce knew the scientific explanation of his crystal controlled oscillator is not important. He did know and use the device and employ the methods which produced the desired results, and which are the device and methods of the patent. De Forest Radio Co. v. General Electric Co., 283 U. S. 664, 686, 51 S. Ct. 563, 75 L. Ed. 1339.

"Having in mind the state of the prior art, I find that plaintiff was not the first and original inventor of the subject-matter disclosed and claimed in the patent in suit."

WOOLLEY, Circuit Judge, dissents.